UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION,<br><br>        Plaintiff,<br>v.<br><br>HCS MEDICAL STAFFING, INC.,<br><br>        Defendant. | Case No. 11-CV-402-JPS<br><br><br>ORDER |

On April 27, 2011, the plaintiff, Equal Employment Opportunity Commission ("EEOC"), filed a complaint against defendant, HCS Medical Staffing, Inc. ("HCS"), seeking injunctive and monetary relief to remedy unlawful employment practices on the basis of sex (pregnancy) under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (Docket #1). Currently pending before the court is the EEOC's renewed motion for default judgment. (Docket #42). This court has reviewed the record, as well as the pleadings and exhibits, and finds that no hearing is necessary. The court will grant the plaintiff's motion for default judgment and will award damages and costs accordingly.

1. Background[1]

HCS is an employment company that provides nurses and therapists to local hospitals, nursing homes, and clinics. Charles Sisson ("Sisson") is the owner and president of HCS. In August of 2007, Sisson terminated his

---

[1]The facts have been taken from the plaintiff's brief in support of its motion for default judgment at Docket #15 and from the Exhibits submitted in support of the motion for default judgment at Docket #16, unless otherwise noted.

bookkeeper, Yolanda Gonzalez ("Gonzalez"), when it was discovered that Gonzalez had embezzled $25,000 from the company. Prior to her termination, Gonzalez had failed to keep current with payroll record-keeping or billing for at least the prior six months, when Gonzalez was first hired.

Upon terminating Gonzalez, Sisson hired a new bookkeeper, Roxy Leger ("Leger"). Leger had various duties, one of which was to organize records to reconstruct the company's record-keeping and billing that had lapsed under Gonzalez. On the same day that Leger became a permanent employee at HCS, she also found out she was pregnant. She informed Sisson of her pregnancy on April 1, 2008. Despite Leger's statements to the contrary, Sisson insisted that Leger was playing an April Fool's Day joke on him. The next day, Sisson referred to Leger's pregnancy as a joke in the morning staff meeting. He insisted that Leger's pregnancy was a joke even after other staff told him that Leger was not kidding.

In May of 2008, Leger brought an ultrasound to work to share with her coworkers. At first, Sisson refused to look at it. He acted uninterested and gave her a "bad feeling." In May of 2008, Leger was still working to reconstruct billing and banking statements from 2007 that had been left in disarray by Gonzalez. This was known to Sisson, who, on May 9, 2008, signed a Restitution Worksheet for the State's embezzlement case against Gonzalez stating that the "repair to our system and accounts…still not complete."

In early September 2008, Leger approached Sisson to discuss the logistics of her maternity leave, including time off and hiring a temporary worker to cover her work while she was gone. Sisson insisted that maternity leave should only be a couple of days so a temporary replacement was not

necessary. Leger told Sisson that under the law she was entitled to six to eight weeks of leave. Sisson insisted that Leger did not have to be off that long and could come back sooner. Leger informed Sisson she would be having the baby by Cesarean section and would not even be able to drive for several weeks afterward. Sisson suggested she have her husband drive her to work. Leger then reiterated that she would be off work for at least eight weeks. Sisson responded that he had things to think about.

On September 15, 2008, Sisson told Leger to stop her other work activities and to finish repairing the 2007 accounts that day, as they were needed for tax filing purposes. Leger completed the work by the next day and began working on reconstructing the records from 2008. About a week later, she attended a meeting with Sisson and a representative from Robert Half Account Temps to go over Leger's job duties. In the meeting, she informed Sisson that she was still behind in the bank reconciliations for 2008 and that she would like a temporary worker to start several weeks prior to going on maternity leave so that she could train the employee and the employee could help her catch up on this work.

In mid-September of 2008, Leger and Sisson were discussing HCS's insurance plan and ways to reduce costs, when Sisson asked if insurance covers the costs of pregnancy. Leger responded that it did. Sisson told Leger "just because somebody's pregnant, doesn't mean I should have to pay for it." Leger was shocked and upset by this comment. In late September, Sisson began to question Leger's frequent doctor visits. Leger was present and heard a speaker phone conversation between Sisson and office manager Heidi Kilburg ("Kilburg") in which Sisson referred to her unborn baby as a "thing" and expressed his belief that Leger went to the doctor too often.

Sisson questioned whether Leger really needed to go to the doctor or "was just looking for some time off." Leger heard Kilburg tell Sisson that Leger's pregnancy was "high risk" and that Leger's appointments were necessary. After this conversation, Leger attempted to avoid sharing any information about her pregnancy with Sisson. Leger was angry that Sisson was questioning her prenatal doctor's visits and that he was discussing them with another employee. Leger was also very upset that Sisson referred to her baby as a "thing." Leger still becomes angry when she thinks about these comments.

During the first week of October, Sisson approached Leger with "great news" and handed her a copy of a patent application filed in 1963 for an "Apparatus for Facilitating the Birth of a Child by Centrifugal Force." The papers given to Leger included graphic diagrams. At the same time, Sisson gave Leger two pages of the description of the purpose and function of the machine. When Sisson handed her these documents, he told her that this would reduce her stress and allow her to come back to work sooner. Leger told Sisson that she would not be having her baby using the "Apparatus" and that she would be on maternity leave for six to eight weeks. Sisson then asked Leger why she was going to the doctor so often. Leger responded it was for her health, to which Sisson responded it was for money. Leger was upset by this interaction, felt sick to her stomach, and had a "creepy feeling."

In early October, Leger and Kilburg traveled together, and Kilburg congratulated Leger, stating that she would be the first pregnant employee of Sisson's who was not terminated during her pregnancy. On October 21, 2008, Leger's doctor put her on bed rest. Leger had saved enough vacation and sick leave to provide partial compensation during her planned eight-

week maternity leave. Sisson approved Leger's leave and partial compensation plan in a telephone call on that same day. On October 21, 2008, Leger informed Sisson that she was on bed rest. While Leger was on bed rest many phone calls occurred between her and Sisson, in which Leger provided assistance on bookkeeping and payroll matters.

Leger's son was born on October 28, 2008. On October 30 and October 31, 2008, Leger called the office to assist with payroll questions. During a call that same week, Leger was asked by Kilburg from what store she would like a gift card. No problems or questions about her work performance were raised during this or any other phone calls Leger had with HCS during her maternity leave.

On October 30, 2008, Sisson terminated Leger and cancelled her family's medical insurance coverage that same day – which went into effect on October 31, 2008. Leger did not learn she was terminated until November 3, 2008. Leger was discharged from the hospital on October 31, 2008. When she arrived home there was a certified mail card waiting for her which she thought was the gift card from her office.

On November 3, 2008, Leger's husband drove her to the post office to pick up what they believed to be the gift card. Opening the letter at the post office counter, Leger realized it was not a gift card but a termination letter and that she had been terminated days earlier. Leger was shocked and emotionally overwhelmed. She had received no warning that she would be terminated and she had never received any discipline while working for HCS.

Leger was unable to tell her husband she was terminated for some time. When she eventually showed him the notice, he became upset.

The termination notice stated that she was terminated for "lack of job performance" and "gross negligence…specifically the accounting/bookkeeping of the general ledger and bank reconciliations for nearly the entire year of 2008." The letter further stated that "awareness of these circumstances has come to the attention of [HCS] only since you have left and begun using up your vacation leave." Leger's husband continually demanded what she had done to cause the termination. Leger felt she could not defend herself, and she was ashamed. Leger cried every day for months. Leger felt extreme distress at her termination and withdrew from her family. She did not tell her mother about the termination for over a week and she did not tell her husband's family for over two months because she was ashamed. Leger also did not bond properly with her new son and pushed most of the parenting responsibilities onto her husband. She became disconnected from her daughter and felt overwhelmed by financial concerns. Leger also had trouble eating, sleeping, and completing other basic tasks.

2.  Discussion

Under Fed. R. Civ. P. 55, the court may enter a default judgment when a party against whom affirmative relief is sought fails to plead or otherwise defend. The decision to enter default judgment lies within the district court's discretion. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993) (citation omitted). As a general rule, a "default judgment establishe[s], as a matter of law, that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint." *Breuer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir. 1982). Upon entry of default, the

Page 6 of 10

Case 2:11-cv-00402-JPS   Filed 02/17/12   Page 6 of 10   Document 43

court takes all well-pleaded allegations in plaintiff's complaint relating to liability as true. *Graham v. Satkoski*, 51 F.3d 710, 713 (7th Cir. 1995).

The Clerk of Court entered default against HCS on January 31, 2012. Accordingly, the allegations of liability contained in plaintiff's complaint, motion for default judgment, and exhibits submitted in support thereof, taken as true, establish that the defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964. HCS intentionally discriminated against Leger on the basis of her sex (pregnancy) when it terminated her employment. (Compl. ¶¶ 7, 9). HCS did so with malice and a reckless indifference to the federally protected rights of Leger. (Compl. ¶ 10). Thus, the court will enter default judgment in favor of the EEOC.

However, "even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (quoting *In re Catt,* 368 F.3d 789, 793 (7th Cir. 2004)). Instead, the court must conduct an inquiry in order to ascertain the amount of damages with reasonable certainty. *Id.* Judgment by default may not be entered without a hearing on damages unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *Id.* (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir.1983)).

Here, the EEOC requests the court render a judgment of default for the statutory maximum of $100,000 for combined compensatory and punitive

damages, as well as $48,340.40 in backpay (including loss of fringe benefits and prejudgment interest) and $1,691.25 for plaintiff's costs. The court will grant these damages requests.

First, the plaintiff has submitted documentation clearly demonstrating that Leger is entitled to $48,340.40 in backpay. This total was achieved by subtracting the compensation Leger actually received from other employment from the estimated compensation she would have received but for the defendant's discrimination. *Fielder v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir. 1982). Moreover, this total includes an enhancement of $17,269.09 for value of benefits lost such as health, disability, and life insurance. The total also includes $1,014.99 in prejudgment interest.

Compensatory and punitive damages for intentional discrimination are statutorily capped on the number of employees employed by the employer during the year of discrimination. 42 U.S.C. § 1981A(b)(3). During the year of discrimination, HCS employed 180 employees, and thus, HCS is subject to a $100,000.00 cap on compensatory and punitive damages. Victims of intentional discrimination prohibited by Title VII may recover compensatory damages for "…emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981A(b)(3).

Here, the plaintiff has submitted the sworn testimony of Leger before the Equal Rights Division Administrative Law Judge and Leger's supplemental declaration. The court finds that this evidence is sufficient to demonstrate Leger's emotional distress. *See Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003) (holding that a plaintiff's affidavit testimony may suffice as the sole evidence of emotional distress if she can explain her injury in

"reasonable detail" or if the facts underlying the case are so inherently degrading that a person would suffer emotional distress from the defendant's actions). As discussed above in the background section in great detail, the circumstances leading up to HCS's discriminatory termination of Leger were inherently humiliating and caused Leger substantial emotional distress. The circumstances surrounding Leger's notification of termination were equally degrading. The detail that Leger has provided and the inherently degrading circumstances that Leger experienced make this a case where Leger's testimony by way of declaration is sufficient to support an emotional distress award. Accordingly, the court will award $50,000 in compensatory damages, payable to Roxy Leger.

The court will also award $50,000 in punitive damages, payable to Roxy Leger. A plaintiff in a Title VII action may recover punitive damages if it shows that the employer engaged in intentional discrimination and engaged in that intentional discrimination "with malice or with reckless indifference to the federally protected rights" of the victim of discrimination. 42 U.S.C. § 1981A(b)(1). The court has already found that the facts alleged in the plaintiff's complaint are taken as true for purposes of a default judgment, including the fact that HCS intentionally discriminated against Leger on the basis of her sex (pregnancy) when it terminated her employment, and that HCS did so with malice and reckless indifference to the federally protected rights of Leger. Moreover, there is no question that the conduct of Sisson, as HCS's agent, can be imputed to HCS. Accordingly, the court will award $50,000 in punitive damages, for a total of $100,000 in compensatory and punitive damages combined.

Lastly, the court finds that plaintiff is entitled to $1,647.85 in costs for transcribing the audio recording of the sworn testimony taken in the Equal Rights Division Hearing and for the making of copies of the criminal file regarding embezzlement of funds from HCS.

Accordingly,

IT IS ORDERED that plaintiff's motion for default judgment (Docket #42) be and the same is hereby GRANTED; the defendant shall pay damages in the amount of $148,340.40 payable to Roxy Leger, consisting of $48,340.40 in backpay (including the value of lost fringe benefits and prejudgment interest) and $100,000 in compensatory and punitive damages; the defendant shall pay plaintiff EEOC $1,647.85 in costs; and

IT IS FURTHER ORDERED that defendant HCS, its officers, successors, assigns, and all persons in active concert or participation with it, shall be permanently enjoined from engaging in pregnancy discrimination and retaliation and any other employment practice which discriminates on the basis of sex or on the basis of opposition to activity unlawful under Title VII.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of February, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge